Robert LAXTON, et ux., Teresa Laxton, Individually and as Next Friend of Both Laxton and Kimberly Laxton, Appellants,

v.

ORKIN EXTERMINATING COMPANY, INCORPORATED, Appellee.

Supreme Court of Tennessee,
at Nashville.

Sept. 13, 1982.

Tommy E. Doyle, Maurine A. Carroll, Townsend & Doyle, Linden, for appellants.

Edward C. Blank, II, N. Houston Parks, Columbia, for appellee.

## OPINION

COOPER, Justice.

This is an action to recover damages for mental anguish, personal injury and property damages resulting from the alleged negligence of defendant in contaminating plaintiffs' water supply with the toxic chemical, chlordane. The trial court directed a verdict for plaintiffs on the issue of negligence, and submitted the issues of causation and damages to the jury. The jury resolved these issues in favor of the plaintiffs, and returned verdicts of $6,000.00 in favor of each plaintiff "for injury, mental pain and suffering (mental anguish)," and a verdict of $6,721.00 in favor of the plaintiffs jointly for property damage and for out-of-pocket expenses.

The Court of Appeals affirmed the judgment for property damages and out-of-pocket expenses, but reversed the judgment

for mental anguish. In doing so, the court relied primarily upon *Memphis St. Ry. Co. v. Bernstein,* 137 Tenn. 637, 194 S.W. 902 (1917), which stands for the principle that there can be no recovery for shock or fright unless it manifests itself in physical injury or physical pain.

We granted the application for permission to appeal to review the action of the Court of Appeals in setting aside the judgment awarding plaintiffs damages for mental anguish.

The facts are not in material dispute. The record shows that plaintiffs live in the rural area of Perry county. At the time of the events that give rise to this action, the water supply to plaintiffs' house was a "spring" located some fifteen to twenty feet in front of their house and near the driveway.

On November 1, 1977, a representative of the defendant company inspected plaintiffs' house and recommended the house be treated for subterranean termites. Plaintiffs then entered into a contract with the defendant, paying $372.00 for the service.

On November 2nd or 3rd, defendant's serviceman sprayed the ground surrounding plaintiffs' house with the chemicals, chlordane and heptachlor. It was raining at the time and the odor from the chemicals was so strong that defendant's employee suggested to the plaintiffs that they spend the night away from home. They did so. When they returned the next day, they found their water had a foul smell and taste.

Plaintiffs contacted the environmentalist for the Perry County Health Department, who suggested plaintiffs call the defendant and also call the State Department of Water Control and inform them of the condition of the water supply.

Plaintiffs followed the advice of the environmentalist and were told by a representative of the defendant that any water contamination that might be due to the chemicals used in the termite treatment would be temporary, that the chemicals used would soon crystallize and would no longer be water soluble.

In response to plaintiffs' call to it, a representative of the State Department of Water Quality Control came to plaintiffs' home and took water samples from the "spring." The analysis of the samples showed the water to be contaminated by chlordane and heptachlor, the chemicals used by the defendant in treating plaintiffs' home for termites. Plaintiffs were notified of the contamination, but not the offending chemicals, and were told to cease using the water for any purpose.

The State Department of Water Quality Control continued to test the water from the "spring" weekly to determine its potability. Each test, in its turn, showed the chemical contamination to be less. The analysis of the water reported on December 9, 1977, showed the level of the contaminating chemicals to be within safe limits. The department so notified the plaintiffs and told them they could use the water from the "spring" with safety.

In the period when the tests were being conducted, plaintiffs did not use the water, except that Mrs. Laxton washed a few loads of clothes and Mr. Laxton took one or two showers and drank a glass of water.

In the months following the tests, plaintiffs used the water from the spring for normal household purposes. On several occasions, when it had been raining, Mrs. Larkin thought she could detect an odor from the water and that the water had a strange taste. The odor and taste proved to be of short duration and she thought little, if anything, of them.

Following an extremely heavy rain, on August 22, 1978, Mrs. Laxton noticed a strong and foul smell coming from the water and it had a distasteful taste. The State Water Quality Control Department was again notified and tests were done. The tests showed the level of chlordane in the water to be in excess of safe limits, and the Laxtons were advised not to use the water for any purpose and that it would be to their benefit to obtain a new water source.

It was at this time that the Laxtons learned that the contaminating chemical was chlordane and that it was a very toxic substance. It was at this time that the Laxtons became worried about their health and that of their children. Mrs. Laxton testified that she became very worried, since they had been using the water for about nine months—that everything she read about chlordane "just tore [her] to pieces." The record further shows that Mrs. Laxton would call her husband at work, and cry and express concern about the future health of her children. In fact, it would be safe to say from the evidence that the more Mrs. Laxton learned of chlordane and its properties, the more the Laxtons worried about their health and the health of their children and possible future health complications.

The mental anxiety of the Laxtons did not evidence itself in any physical way. Neither was it severe enough to require medical treatment.

In September, 1978, Mrs. Laxton noticed a general malaise in her children. The children appeared listless but were not apparently ill. The Laxtons took the children to the family physician, who, knowing the history of the water contamination and the properties of chlordane, took blood samples from the plaintiffs and the children for examination by pathologists. Test results dated September 22, 1978, showed no abnormalities, but indicated that the Laxtons had had a mild sub-acute reaction to a viral infection. In light of the test results and the fact that the Laxtons had changed to a new water source and were no longer being exposed to chlordane, Dr. Turner advised the Laxtons that there was no necessity for them to have more extensive blood tests made.

The courts of this state, and courts generally, have denied plaintiffs damages where the defendant's negligence causes mental disturbance, without accompanying physical injury or physical consequences, or without other independent basis for tort liability. *See Medlin v. Allied Investment Co.,* 217 Tenn. 469, 398 S.W.2d 270 (1966); *Bowers v. Colonial Stages Interstate Transit Co.,* 163 Tenn. 502, 43 S.W.2d 497 (1965); 64 A.L. R.2d 100, at 115. *See also* Restatement (Second) of Torts § 436(a) (1979), wherein it is pointed out in comment (c) that the denial of damages for emotional disturbance alone

> applies to all forms of emotional disturbance including temporary fright, nervous shock, nausea, grief, rage, and humiliation. The fact that these are accompanied by transitory, nonrecurring physical phenomena, harmless in themselves, such as dizziness, vomiting, and the like, does not make the actor liable where such phenomena are in themselves inconsequential and do not amount to any substantial bodily harm. On the other hand, long continued mental disturbance, as for example in the case of repeated hysterical attacks, or mental aberration, may be classified by the courts as illness, notwithstanding their mental character.

In this state, exceptions to the general rule have been made and recovery of damages for mental disturbance alone allowed in cases where the mental anguish was due to the negligent handling of a corpse or the negligent transmission of a telegraph or telephone message. *See Bowers v. Colonial Stages Interstate Transit Co.,* 163 Tenn. 502, 43 S.W.2d 497 (1931). An exception also has been made where the mental disturbance is caused by the "extreme and outrageous" conduct of the defendant. *Moorhead v. J. C. Penney Co., Inc.,* 555 S.W.2d 713 (1977). Recovery of damages resulting from the ingestion of deleterious food or beverages also has been permitted in numerous cases in this state, though physical injury, if any, was slight.[1] In most of them the major element of damages has been fright, shock, anxiety, or mental revulsion. In some of the cases, nausea has

---

1. *See generally Ford v. Roddy Mfg. Co.,* 60 Tenn.App. 495, 448 S.W.2d 433 (1969) (insects in soft drink).

resulted;[2] in some of them medical assistance was required.[3] In a few, serious physical consequences, such as food poisoning, resulted.[4] In many of them, however, recovery was permitted with a minimum showing of physical injury; where this did occur full recovery has been allowed for the fright, shock, or other "mental" aspect of the claim.

In our opinion, the present case can be reconciled with those cases. Here it is undisputed that the plaintiffs ingested polluted water when the defendants negligently permitted dangerous chemicals to infiltrate plaintiffs' household water supply. The plaintiffs needed and obtained medical services after using the spring. There is no question as to the reasonableness of the medical expenses. Nor is there any claim that the expenses were not necessary under the circumstances. The chemical which polluted their spring was a possible carcinogen. Even though the tests proved negative, in our opinion a jury could find sufficient "injury" to these plaintiffs to justify a recovery for their natural concern and anxiety for the welfare of themselves and of their infant children.

In submitting plaintiffs' claim for damages to the jury, the trial judge told the jury that:

If [the plaintiffs] ingested any amount of the toxic substance, it is the judgment of the Court that that is at least a technical physical injury. But it is not an injury from which they are entitled to substantial damages under the facts of this case, that is from a physical injury.

But, where there is any physical injury at all—any attendant mental pain and suffering is compensable. And so, I charge you that you may, if you find it supported by the proof, award to one or the other or each of the plaintiffs, such an amount as in your judgment would fairly compensate the plaintiffs for mental suffering as a result of reasonable apprehension of harmful effects to their own health and the health of their children, due to the ingestation of the toxic substances.

This mental suffering, I charge you, must be limited to suffering during that period of time—from the time they first became aware of having ingested the toxic chemical, until they were advised in effect by Dr. Gordon Turner that further investigation of the effect of the chemicals ingested was not necessary.

We see no basic error in this instruction, when applied to the circumstances of this case. In our opinion, in addition to cases where it has previously been allowed, recovery for the negligent infliction of mental anguish should be allowed in cases where, as a result of a defendant's negligence, a plaintiff has ingested an indefinite amount of a harmful substance. In such cases the finder of fact may conclude that the plaintiff has sustained sufficient physical injury to support an award for mental anguish even if subsequent medical diagnosis fails to reveal any other physical injury. The period of mental anguish, of course, would be confined to the time between discovery of the ingestion and the negative medical diagnosis or other information that puts to rest the fear of injury.

Orkin insists in its single assignment of error "that the Court of Appeals erred in not reversing the judgment of the trial court on the ground that the verdict was the product of prejudice, passion and caprice." We note that Orkin did not question the amount of damages for mental anguish, in its motion for new trial. Neither did it charge that the jury verdict was the product of prejudice, passion, or caprice. The latter issue, however, was raised in the Court of Appeals and was considered by that court, without objection by the plain-

---

2. *Boyd v. Coca Cola Bottling Works,* 132 Tenn. 23, 177 S.W. 80 (1914) (cigar stub in soft drink).

3. *Roddy Mfg. Co. v. Cox,* 7 Tenn.App. 147 (1927) (dead mouse in soft drink; plaintiff suf-

fered nausea and saw doctor "who washed out his stomach and gave him some medicine").

4. *Jones v. Mercer Pie Co.,* 187 Tenn. 322, 214 S.W.2d 46 (1948).

tiffs. On reviewing the record, the Court of Appeals concluded that the jury's verdict was proper and was not the product of prejudice, passion, or caprice. We agree with that conclusion.

The judgment of the Court of Appeals is reversed and the judgment of the trial court is reinstated and affirmed. Costs are adjudged against Orkin Exterminating Company, Inc. The cause will be remanded to the trial court for enforcement of its judgment.

HARBISON, C. J., and FONES, BROCK and DROWOTA, JJ., concur.